**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOSE SILVA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18 C 1300 |
| ) | |
| ) | Judge Rebecca R. Pallmeyer |
| JACQUELINE MITCHELL, K. BROOKS, ) | |
| ALMA MARTIJA, M.D., and GHALIAH ) | |
| OBAISI, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jose Silva ("Plaintiff"), an inmate at Stateville Correctional Center ("Stateville"), has suffered from chronic vertigo, dizziness, and related symptoms since July 2013, when he underwent a dental procedure at the prison. In 2018, Plaintiff brought suit under 42 U.S.C. § 1983, alleging that Dr. Kenneth Brooks, Dr. Alma Martija, Dr. Saleh Obaisi, and Dr. Jacqueline Mitchell were deliberately indifferent to his serious medical condition in violation of the Eighth Amendment. Defendants Brooks, Martija, and Ghaliah Obaisi (as the independent executor of Dr. Obaisi's estate) ("Defendants"), moved for summary judgment [64].[1] Defendant Mitchell, represented by different counsel, also moved for summary judgment [81]. For the reasons explained below, Mitchell's motion [81] is granted. Defendants' motion [64] is granted as to Brooks and Martija, but denied as to Obaisi.

---

[1]        Due to Dr. Obaisi's death, the named defendant in this lawsuit is his estate. The court refers to "Dr. Obaisi" or "Defendant Obaisi" throughout this opinion.

## BACKGROUND

The facts are set forth in the Plaintiff's submissions and in Rule 56.1 statements submitted in support of both defense motions for summary judgment.[2]

### I. **The Parties**

Plaintiff Jose Silva, age 62, has been incarcerated in the Illinois Department of Corrections ("IDOC") since 2003, and is currently in custody at Stateville Correctional Center ("Stateville"). (Defs. Obaisi's, Martija's & Brooks' Local Rule 56.1 Statement of Facts [66] (hereinafter "Defs.' SOF") ¶ 1; IDOC Offender Profile, Ex. 2 to Defs.' SOF [66-1].)[3] Prior to his death on December 23, 2017, Dr. Obaisi was employed by Wexford Health Sources, Inc. ("Wexford") as the Medical Director at Stateville. (Defs.' SOF ¶ 2.) Dr. Martija was employed as a staff physician, and Dr. Brooks and Dr. Mitchell were employed as dentists. (Defs.' SOF ¶¶ 3–4; Def. Mitchell's Local Rule 56.1 Statement of Facts [83] (hereinafter "Mitchell's SOF") ¶ 2.) Plaintiff saw other medical providers, not named as Defendants here, as well.

The Defendants had varying levels of involvement in Plaintiff's medical care. Dr. Obaisi oversaw Plaintiff's course of treatment from September 2013 to December 2017 (Defs.' SOF ¶¶ 25–68), Dr. Martija saw Plaintiff three times at the general medical clinic, (*id.* ¶¶ 45, 57, 60), Dr. Brooks saw Plaintiff only once for a cavity filling (*id.* ¶ 16), and Dr. Mitchell saw Plaintiff three to four times for dental care. (Mitchell's SOF ¶¶ 5, 6, 7; Pl.'s Compl. [1] (hereinafter "Compl.") ¶

---

[2]    Defendants object to Plaintiff's factual assertions on several grounds. The court addresses these issues in its analysis below, and incorporates those rulings into its presentation of the facts.

[3]    Defendants attached seven exhibits to their statement of facts, which are contained in one docket entry. (Exs. 1–7 to Defs. SOF [66-1]). The ECF page numbers for Defendants' exhibits are as follows: Silva Dep. (Ex. 1 at 1–75), IDOC Offender Profile (Ex. 2 at 76–77), Stateville Medical Records (Ex. 3 at 78–157), St. Joseph's Medical Records (Ex. 4 at 158–161), Decl. of Kenneth Brooks (Ex. 5 at 162–164), Decl. of Alma Martija (Ex. 6 at 165–171), and Decedent Obaisi's Estate Documents (Ex. 7 at 172). The court adopts the parties' citation format for frequently cited documents: the court refers to Plaintiff's deposition by the relevant transcript page, his medical records by their Bates-numbering ("IDOC 000000" and St. "Joseph 000000"), and the declarations by their paragraph numberings.

90.)  Plaintiff asserts that these providers were deliberately indifferent to his serious medical needs.  He contends that Dr. Obaisi and Dr. Martija persisted in an ineffective treatment of his vertigo symptoms, and points to their continued use of Meclizine (a medication used to treat nausea, vomiting, dizziness, and loss of balance), delayed neurology referrals, failure to make an ENT referral, and inadequate treatment of his Meniere's disease, labyrinthitis, and neurological conditions.  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [75] (hereinafter "Pl.'s Mem.") at 8–9.)  Plaintiff also argues that Dr. Brooks' dental procedure amounted to deliberate indifference and that Dr. Mitchell failed to treat his medical condition on the four times she provided him with dental care.  (Id. at 9–10; Pl.'s Mem. in Opp'n to Def. Mitchell's Mot. for Summ. J. [88] (hereinafter "Pl.'s Mem. to Mitchell") at 4–6.)  The parties have presented detailed evidence of Plaintiff's lengthy medical history at Stateville from 2013 to 2017, which the court reviews below.

II.    **Plaintiff's Medical Treatment**

   A. **2013**

   The allegations in Plaintiff's complaint begin with his July 19, 2013 cavity filling by Dr. Brooks.  (Compl. ¶ 43.)  Prior to this date, the record shows that Plaintiff sought medical treatment at Stateville on three occasions, none of which involved the individual Defendants.  On September 24, 2010, he presented to a correctional medical technician complaining of ongoing dizziness and lack of balance, and the technician sent Plaintiff to Dr. Ronald Schaefer for evaluation.  (Defs.' SOF ¶ 12.)  Plaintiff saw Dr. Schaefer the same day, and again complained of dizziness, which happened mostly when he stood; Plaintiff testified that the dizziness he experienced in 2010 was a response to the heat and less severe than what came later.  (Defs.' SOF ¶ 12; Pl.'s Resp. to Defs.' SOF [76] (hereinafter "Pl.'s Resp.") ¶¶ 12–13; Silva Dep., Ex. 1 to Defs.' SOF [66-1] (hereinafter "Silva Dep.") 51:17–52:15.)

   Plaintiff saw physician's assistant ("PA") LaTanya Williams twice in fall 2010.  On October 13, 2010, Plaintiff complained of itching, elbow pain, and congestion, and was given a Romberg test, which examines neurological function to test for balance.  (Defs.' SOF ¶ 14.)  The

parties dispute the results of that test; the medical record shows a plus sign or asterisk beside the word "Romberg," which Defendants interpret as an indication of a positive test result. (IDOC Stateville Medical Rs., Ex. 3 to Defs.' SOF [66-1] (hereinafter "IDOC") at 79.) Plaintiff disputes this. (Pl.'s Resp. ¶ 14.) On November 10, 2010, Plaintiff complained of continued pain in his elbow and knee, but no balance or dizziness issues. (Defs.' SOF ¶ 15.)

There is no evidence of further medical treatment until July 19, 2013, when Plaintiff saw the dentist, Dr. Brooks, for a tooth restoration (i.e. cavity filling) for teeth numbers 15 and 16, the rear molars on his upper left side. (Defs.' SOF ¶ 16; Compl. ¶ 43.) Dr. Brooks asserts that before carrying out this procedure, he used two carpules of 2% lidocaine (a local anesthetic commonly used in dental procedures) and a short gauge needle to anesthetize Plaintiff's teeth. (Decl. of Kenneth Brooks, Ex. 5 to Defs.' SOF (hereinafter "Brooks Decl.") ¶ 4.) Plaintiff contends instead that Dr. Brooks used a long, hypodermic needle to inject the anesthesia, and that after receiving this injection, Plaintiff "began to experience facial pain." (Compl. ¶ 44.) Plaintiff also asserts that Dr. Brooks injected him "so deeply" that he "penetrat[ed] the plaintiff's nerves." (Compl. ¶ 44.) Dr. Mitchell, who was treating another patient in the same room at the time, was not involved with Dr. Brooks' procedure. (Mitchell's SOF ¶ 5.)

Ten days later, on July 29, Plaintiff was experiencing "excruciating left sided facial pain." (Compl. ¶ 45.) Plaintiff explained to an unidentified doctor that he had had his tooth filled a week earlier and was now experiencing "dizzy spells" and that the "left side of [his] face has been hurting very badly." (IDOC 38.) The doctor noted that Plaintiff was not in acute distress and had been given Ibuprofen for pain after his tooth filling. (Defs.' SOF ¶ 19.) The doctor provided Plaintiff with Tylenol, Maalox, and a referral for further dental treatment, and directed him to increase his fluid intake and return to the health care unit as needed. (Id.) Plaintiff saw a dentist the next day, July 30, but the medical records do not clearly state what care Plaintiff received. (Pl.'s Mem. at 10; IDOC 339.)

About a week later, on August 6, Plaintiff saw another doctor, Dr. Davis (first name not identified).[4]  (Silva Dep. 57:7–58:3.)  During his first appointment with her, Plaintiff complained of three weeks of left-sided facial pain and swelling, as well as a sore throat and fever.  (Defs.' SOF ¶ 20; IDOC 40.)  Plaintiff's left face was "grossly edematous" (abnormally swollen with fluid) and "very tender" near his left sinuses.  (IDOC 40); www.merriam-webster.com/dictionary/edematous.[5]  Dr. Davis also noted "[l]eft sided acute bacterial sinusitis," and prescribed two antibiotics, fish oil, and Prednisone.  (IDOC 40; Defs.' SOF ¶ 20.)  Prednisone is a corticosteroid used to treat a variety of conditions; the record does not make clear what conditions the Prednisone and fish oil were intended to treat.  www.medlineplus.gov /druginfo/meds/a601102.html.  Dr. Davis directed Plaintiff to follow up in two to three weeks.  (Defs.' SOF ¶ 20.)

Instead, two days later, on August 8, nursing staff notified Dr. Davis that Plaintiff's pain and edema had worsened.  (Defs.' SOF ¶ 21; IDOC 41.)  She prescribed Norco (a narcotic strength medication for moderate to severe pain) and substituted a new antibiotic prescription for one the Plaintiff had been taking.  (Defs.' SOF ¶ 21.)  On August 13, Plaintiff again saw Dr. Davis for an evaluation of his sinusitis and knee pain, and complained of "balance disturbance [and] vertigo."  (IDOC 41.)  The doctor noted that Plaintiff was not in acute distress and the tenderness at his left maxillary sinus was improving, so Plaintiff's Norco prescription was discontinued, and he was instead prescribed Nasonex (a nasal spray to treat allergy symptoms).  (Defs.' SOF ¶ 22); www.medlineplus.gov/druginfo/meds/a602024.html.

---

[4]     Neither party identified Dr. Davis in their statements, but Plaintiff testified that he thought he saw Dr. Davis on August 6, 2013.  (Silva Dep. 57:7–58:3.)  The Stateville medical records typically contain the treating physician's signature, but the signatures are largely indecipherable.  It appears that the same doctor who signed Plaintiff's medical records on August 6 (presumably Dr. Davis) also signed his medical records on other occasions in August 2013, including the 8th, 13th, and 17th, as well as October 2, 2013, January 15, 2014, and February 27, 2014.  (IDOC 40–45, 47–48, 57, 64, 697.)

[5]     All websites referenced in this opinion were last visited September 29, 2021.

A few days later, on August 16, Plaintiff saw a sick call nurse. (Compl. ¶ 50.) Sick call is a process at Stateville that allows inmates to sign up and request evaluation by a nurse; inmates are typically seen by a nurse within one day. (Defs.' SOF ¶ 7.) Plaintiff complained of dizziness and nausea, explained that the medical problems began with his dental procedure, and stated that the procedure caused his head and mouth to become infected. (Compl. ¶ 50.) The following day, August 17, he was seen for a follow-up sinusitis evaluation by Dr. Davis. (IDOC 44.) Plaintiff stated that he felt "like the room [was] spinning" and that he was "woozy," but he also reported that his pain was lessening. (*Id.*) Dr. Davis noted that there was no exudate (discharge or oozing) or nystagmus (fast, uncontrollable movements of the eyes), but noted cobblestoning (throat irritation due to extra mucus). (Defs.' SOF ¶ 23); www.medlineplus.gov/ency/article/003037.html; www.healthline.com/ health/cobblestone-throat. She also noted that Plaintiff's sinusitis was resolved, but that he had residual vertigo; she directed Plaintiff to continue using Nasonex and provided a new prescription for Meclizine, an antihistamine that prevents and treats nausea, vomiting, dizziness, and loss of balance. (Defs.' SOF ¶ 23.) Plaintiff's August 28 medical appointment was rescheduled due to a prison lockdown. (*Id.* ¶ 24.)

On September 16, about a month and a half after Plaintiff first complained of dizziness, Plaintiff saw Dr. Obaisi. (*Id.* ¶ 25.) Plaintiff explained that while he did not have any problems when lying down, he otherwise suffered from dizziness, was unable to stand or walk for a long period of time, and had fallen due to dizziness several times in the past few months. (Pl.'s Resp. ¶ 25; Defs.' SOF ¶ 25.) Dr. Obaisi examined Plaintiff and concluded that he suffered from disequilibrium, but that his ears and tandem gait were "ok." (Defs.' SOF ¶ 25; IDOC 46.) "Tandem gait is tested whereby the patient walks in a straight line – heel to toe – to determine if he has ataxia (loss of coordination of muscle movement, which includes walking)." (Def.'s SOF ¶ 25 n.5.)

Dr. Obaisi then ordered diagnostic testing[6] and again prescribed Meclizine.[7]  (Defs.' SOF ¶ 25.)

Approximately two weeks later, on October 2, Plaintiff saw Dr. Davis again.  (IDOC 47–48.)

Plaintiff stated that the pain in his face was gone, but reported that he was "not feeling good," and

when he sat down, he felt that he might fall over.  (IDOC 47.)  Dr. Davis noted that Plaintiff was

taking Loratadine (an antihistamine), Flunisolide (nasal spray), and Meclizine, and referred

Plaintiff to a physical therapist to evaluate the vertigo.  (Defs.' SOF ¶ 26.)  There is no evidence

in the record showing that Plaintiff saw a physical therapist based on this referral.  On October 9,

Plaintiff had several lab tests that appear to correspond to the diagnostic testing ordered by Dr.

Obaisi.  (*Id.* ¶ 27; IDOC 52.)

On October 18, Plaintiff saw Dr. Mitchell for dental care.  (Mitchell's SOF ¶ 6.)  The parties

dispute what occurred during that appointment.  Plaintiff asserts that he told Dr. Mitchell about

the cavity filling performed by Dr. Brooks and resulting pain, and that Dr. Mitchell did nothing.

(Pl.'s Resp. to Def. Mitchell's Local Rule 56.1 Statement of Facts [87] (hereinafter "Pl.'s Resp. to

Mitchell") ¶ 6.)  Dr. Mitchell, on the other hand, asserts that Plaintiff complained of dizziness and

feeling sick and that she referred him to Dr. Obaisi.  (Mitchell's SOF ¶ 6.)  The evidence that Dr.

Mitchell cites, however (Plaintiff's deposition testimony that she did nothing on this day and that

on an unidentified day she referred him to Dr. Obaisi), does not support her version of events.

(Silva Dep. 146:23–147:3, 149:17–150:4.)

---

[6]     Defendants do not specify which diagnostic tests were ordered, but Plaintiff alleges
that the blood work checked for venereal diseases.  (Compl. ¶ 52.)  In the "plans" section of the
September 26 medical records, Dr. Obaisi lists numerous abbreviated words, which appear to be
the testing he ordered.  (IDOC 46.)  The court cannot discern all the abbreviations.  Some appear
to support Plaintiff's contention (such as "HIV"), but others appear to be broader testing (such as
"CMP," or comprehensive metabolic panel).     www.tabers.com/tabersonline/view/Tabers-
Dictionary/737047/all/comprehensive_metabolic_panel.

[7]     The parties and medical records use the terms Medizine and Antivert, which is the
brand name for Meclizine.  (Defs.' SOF ¶ 25.)  The court uses the term Meclizine throughout this
opinion.

In any event, there is no record that Plaintiff received any further medical attention until the end of 2013.  For reasons unclear from the record, Plaintiff was a no-show for a sick call appointment on December 20.  (Defs.' SOF ¶ 28.)  He was seen by a nurse on December 27. (Defs.' SOF ¶ 29.)  In a physical exam form completed that day, the nurse circled "Y" to indicate that Plaintiff was experiencing nausea and tinnitus, and could not walk in a straight line with his eyes closed.  (Defs.' SOF ¶ 29; IDOC 56.)  The nurse also noted that Plaintiff was not experiencing vomiting, hearing loss, reddened ear canals, signs or symptoms of an ear infection, or diplopia (double vision).  (Id.); www.healthline.com/health/diplopia.  Finally, the nurse noted that Plaintiff was "dizzy all the time," and that his pupils and hand grips were normal.  (Id.)  Plaintiff continued to take Claritin and Meclizine 12.5 mg as needed, and was referred to a doctor for evaluation. (Defs.' SOF ¶ 29.)

## B.  2014

On January 15, 2014, Plaintiff followed up with Dr. Davis, and reported that he felt "so-so," his "dizziness [and] balance comes [and] goes," and he sometimes could not tell if he was "up or down."  (IDOC 57.)  Dr. Davis noted that Plaintiff was not in any distress, instructed Plaintiff to follow up as needed, and prescribed Meclizine and skin medication (the latter for a skin condition not at issue here).  (Defs.' SOF ¶ 30.)  More than a month later, on February 27, she issued Plaintiff medical permits for a low bunk, restraints, and a knee brace.  (Id. ¶ 31; IDOC 64, 697.)

On March 3, Plaintiff complained to unidentified "healthcare professionals" of "worsen[ed] symptoms."[8]  (Compl. ¶ 56, at 107.)  The provider noted in Plaintiff's physical exam that he was

---

[8]    Defendants omit some medical records on summary judgment, including two of Plaintiff's medical appointments in early March 2014.  Plaintiff described these appointments in his verified complaint and attached the relevant IDOC medical records to his complaint.  (Compl. ¶¶ 57–59.)  The court considers these appointments (and other appointments that Defendants omit from their statement of facts) on summary judgment to the extent they are supported by admissible record evidence.  The court refers to the medical records attached to Plaintiff's Complaint [1] by ECF page number.  Given the length of Plaintiff's complaint, his later medical records were filed as an exhibit [1-1].  The court refers to this document as "Ex. 1 to Compl.," and again uses ECF page numbers to cite specific records.

experiencing diplopia, nausea, hearing loss, tinnitus, dizziness, and problems walking, but not reddened ear canals or signs and symptoms of ear infection. (*Id.* at 107.) According to Plaintiff, the only medical treatment he received was "being educated and reassured"; the medical records do not make clear whether he received additional treatment, but the provider noted he was currently taking Meclizine. (*Id.* ¶ 56, at 107.) On March 7, Plaintiff complained of dizziness to a sick call nurse and reported that a correctional officer had to walk him to the bus because of balance issues. (*Id.* ¶ 57.) Plaintiff also reported that "it's like a fullness in my head all the time," and the nurse noted that his left ear was reddened, with thick white pus. (*Id.* at 108.) The medical records do not make clear what treatment Plaintiff received, but he testified that he was given eardrops. (Silva Dep. 71:19–73:9.) On March 11, Plaintiff saw PA Williams and complained of ongoing dizziness; PA Williams continued Plaintiff's current medications and referred him to Dr. Obaisi. (Defs.' SOF ¶ 32.) On March 21, an unidentified provider treated Plaintiff's knee pain with pain medication. (Compl. ¶ 59.)

When Plaintiff saw Dr. Obaisi on April 4, his symptoms had worsened; he had "severe disequilibrium," was unable to walk for more than a short distance, was falling down more frequently, had lost approximately 20 pounds in the previous few months, and had sluggish eyes and slurred speech. (IDOC 69; Defs.' SOF ¶ 33.) Plaintiff also testified that he felt "a little pressure" in his eye, his ear was hurting "a little bit," his equilibrium "was really off," he "couldn't walk," and he "was really dizzy." (Silva Dep. 74:12–17.) Dr. Obaisi transferred Plaintiff to St. Joseph's Medical Center that same day, where Plaintiff was seen by Dr. Anar J. Patel. (Defs.' SOF ¶¶ 33–34.) Plaintiff told Dr. Patel about the July 19, 2013 dental procedure, asserted that the "needle went farther than it was supposed to," and explained that "he developed severe pain in the left side with subsequent infection of his left side of his face." (St. Joseph's Medical Records, Ex. 4 to Defs.' SOF (hereinafter "St. Joseph") at 24.) Dr. Patel noted that since the dental procedure, Plaintiff had reportedly suffered from "chronic vertigo," and despite taking Meclizine twice a day, "had an exacerbation of [chronic vertigo] where increased dizziness is not

improved" with Meclizine. (*Id.*) Dr. Patel also noted that Plaintiff was alert and oriented, with 5/5 strength (meaning he had normal muscle strength according to a manual muscle test), and no nystagmus, but that Plaintiff becomes "symptomatic with turning his head in either direction and with movement and ambulation" and "has minimally ataxic" (unsteady) gait. (*Id.*); www.tabers.com/tabersonline/view/Tabers-Dictionary/743864/0/manual_muscle_test; www.tabers.com/tabersonline/view/Tabers-Dictionary/762890/all/. Dr Patel ordered an EKG, which came back normal, and referred Plaintiff to neurology and ENT (ears, nose, throat) specialists. (Defs.' SOF ¶ 34.) Dr. Patel believed Plaintiff's symptoms were "more consistent with a chronic illness such as labyrinthosis or Meniere's disease secondary to his facial infection in the past rather than benign positional vertigo."[9] (St. Joseph 25.)

While Plaintiff was at St. Joseph's, Dr. Patel prescribed Valium (anti-anxiety medication), Zofran (anti-nausea medication), and Meclizine. (St. Joseph 25); www.medlineplus.gov/druginfo/meds/a682047.html; www.medlineplus.gov/druginfo/meds/a601209.html. Dr. Patel noted that Plaintiff "improved" after taking these prescriptions during his stay at St. Joseph's; the record does not make clear how long Dr. Patel observed Plaintiff or how long Plaintiff stayed at St. Joseph's. (St. Joseph 25.) The record is also silent on Plaintiff's condition and medical care between the April 4 transfer to St. Joseph's and April 9, when Plaintiff saw Dr. Obaisi at Stateville. Plaintiff complained to Dr. Obaisi of a "severe equilibrium balance problem," and Dr. Obaisi treated him with medication and directed him to follow-up in five weeks. (Compl. ¶ 62, at 114.) But Plaintiff saw Dr. Obaisi just a few days later, on April 14, at which time Plaintiff reported that

---

[9]    Labyrinthosis is irritation and swelling of the inner ear that can cause vertigo and hearing loss, and typically lasts a few weeks. www.medlineplus.gov/ency/article/001054.htm. Meniere's disease is a chronic disorder of the inner ear, and can cause severe dizziness (vertigo), tinnitus, hearing loss, and feelings of fullness or congestion in the ear; there is no cure, but symptoms may be treated. www.nidcd.nih.gov/health/menieres-disease. Benign positional vertigo (also called benign paroxysmal positional vertigo or BPPV) is the most common type of vertigo; it is caused by an inner ear problem, which occurs when small pieces of calcium break free and float inside tubes in the inner ear. www.medlineplus.gov/ency/article/001420.htm.

his dizziness was slowly improving. (Defs.' SOF ¶ 35.) On the exam notes for this visit, Dr. Obaisi wrote "no acute findings"; Defendants do not define or explain the significance of this phrase, despite referencing it multiple times in their statement of facts.[10] (Defs.' SOF ¶ 35.) Two weeks later, on April 28, Plaintiff followed up with Dr. Obaisi regarding his lightheadedness; Dr. Obaisi noted that Plaintiff was still unstable when walking, tended to fall to the left, and had a positive indication on his Romberg balancing test. (Defs.' SOF ¶ 36.) The same day (April 28), Dr. Obaisi made a referral to UIC Neurology for an MRI of Plaintiff's head, which was approved by Wexford on May 5. (Defs.' SOF ¶ 36.) The MRI was not performed until December 11; the parties do not discuss who was responsible for this delay. (Pl.'s Resp. ¶ 39.)

Before the MRI was performed, Plaintiff saw medical personnel at Stateville several times. On June 8, he was seen by a certified medical technician and complained of equilibrium and painful ears; the technician noted that his ears appeared to be "slightly red." (Compl. ¶ 65, at 142.) On July 4, Plaintiff presented to a sick call nurse with a swollen left side of his face and left ear pain, and reported that his "equilibrium is off when I get up quickly." (Defs.' SOF ¶ 37; IDOC 79.) The nurse noted that there was no throat redness, Plaintiff's ears were clear, and that he had steady gait and clear speech. (IDOC 79.) Additionally, the nurse observed that Plaintiff's ear drum was intact. (*Id*.) Medical notes also indicate that Plaintiff had no hearing loss, though Plaintiff testified that he did not recall ever having had a hearing test performed at Stateville and that no medical staff member ever performed a "finger rub hearing test" (a test that entails rubbing fingers near the patient's ear). (*Id*.; Silva Dep. 79:2–12.) The nurse instructed Plaintiff to continue taking Claritin and nasal spray and to follow up with a sick call nurse as needed. (IDOC 79.) Later that month, on July 16, Plaintiff saw Dr. Mitchell and again complained of a swollen face.

---

[10]     A medical dictionary defines "acute" as having three possible meanings: (1) "Of pain, sharp, severe," (2) "Of diseases, having rapid onset, severe symptoms, and a short course," as opposed to chronic diseases, and (3) "Of the senses, perceiving keenly and accurately." www.tabers.com/tabersonline/view/Tabers-Dictionary/735903/0/acute.

(Mitchell's SOF ¶ 7.)  Plaintiff asserts that Dr. Mitchell did not examine Plaintiff's mouth, administered no treatment, and referred Plaintiff to Dr. Obaisi.  (Pl.'s Resp. ¶ 7.)

Plaintiff stopped taking Meclizine at some point in September due to a side effect that made him feel drowsy. (Silva Dep. 88:5–16; IDOC 283.) He saw Dr. Obaisi on September 30 and October 1.  (Compl. ¶ 68.)  On September 30, Dr. Obaisi noted that Plaintiff had not yet received his MRI; the medical records do not make clear whether Dr. Obaisi provided any treatment that day. (IDOC 83.) On October 1, Plaintiff complained that he was still dizzy and had loss of balance; Dr. Obaisi noted that there was a positive indication for Romberg, prescribed Nasacort (a nasal spray to relieve allergy symptoms), and made a referral to UIC for Plaintiff's unsteady gait.  (Defs.' SOF ¶ 38); www.medlineplus.gov/druginfo/meds/a682791.html.  Plaintiff did not see a neurologist at UIC until May 14, 2015. (*Id.* ¶ 41.) It is not clear when Wexford approved this referral, and there is no evidence in the record about who was responsible for this this delay.[11]

On December 11, 2014, more than eight months after the first referral was recommended by Dr. Patel, Plaintiff was at last sent to UIC Neurology for an MRI and evaluation. (Defs.' SOF ¶ 39.) When plaintiff next saw Dr. Obaisi, on December 22, 2014, Dr. Obaisi had not yet received the MRI report from UIC; he only prescribed skin medications and directed Plaintiff to follow up in two weeks. (Defs.' SOF ¶ 40; Pl.'s Resp. ¶ 40.) The record does not make clear whether the follow-up was for Plaintiff's MRI, and there is no evidence that this two-week follow-up in fact occurred. Nor does the record make clear when Dr. Obaisi received the MRI report. The next reference to the MRI report is not until May 13, 2015, when a neurologist at UIC reviewed it; Dr.

---

[11]     Plaintiff asserts that Dr. Obaisi did not approve the referral to UIC until May 15, 2015. (Pl.'s Resp. ¶ 38).  The record Plaintiff cites for this assertion shows that Dr. Obaisi signed the referral on October 1, 2014 in the section for the referring practitioner, and then signed the referral again on May 14, 2015 in the section for the medical director's approval or denial of the specialist's recommendations.  (IDOC 282.)  As the court reads the record, Dr. Obaisi approved the referral on October 1, 2014; the May 14, 2015 signature indicates he reviewed Dr. Rathore's recommendations from Plaintiff's May 13, 2015 appointment, discussed below.

Obaisi signed the neurologist's findings on May 14, 2015, and did not discuss the neurologist's recommendations with Plaintiff until May 21.

### C. 2015

There is no evidence that Plaintiff received any medical treatment from the end of 2014 until April 2015—perhaps because, as Plaintiff noted in his complaint, he did not receive medical records covering this time period from Stateville's medical records office. (Compl. ¶ 71.) The next evidence of medical care is on April 25, 2015, when Plaintiff complained to a sick call nurse of "equilibrium disorder, nausea, dizziness and problems when walking having to hold the wall." (Compl. ¶ 72.)

Then, on May 13, 2015, Plaintiff saw Dr. Javier S. Rathore, a neurologist at UIC. (Defs.' SOF ¶ 41.) Plaintiff reported dizziness that "comes and goes 2–4 times" every day, nausea (but no vomiting), tilting to the left side, falling a few times (though not recently), and a sensation that the room was spinning, which made his gait unsteady. (IDOC 283.) Dr. Rathore reviewed Plaintiff's MRI, and found that it revealed no "acute intracranial process," but that Plaintiff suffered from "moderate generalized (including medial temporal lobes) cerebral volume loss, out of proportion to the patient's age," conditions that were "likely incidental" (meaning unrelated to the primary objective of the imaging). (Defs.' SOF ¶ 39; IDOC at 286); www.acr.org/Clinical-Resources/Incidental-Findings. Dr. Rathore made no differential diagnosis or clinical findings of dementia, but due to Plaintiff's family history, Dr. Rathore stated: "Dementia labs may be considered as below." (IDOC 283; Defs.' SOF ¶ 41.) Dr. Rathore's medical notes also state that Plaintiff had taken Meclizine for six months and it helped a "little bit," but that he had stopped taking Meclizine in September 2014. (IDOC 283.) Dr. Rathore recommended Meclizine 12.5 mg, titrated as tolerated, and "vestibular rehab for vertigo (epley's manuvre[sic])." (IDOC 286; Defs.' SOF ¶ 41.) The Epley maneuver is an exercise that relieves dizziness caused by benign paroxysmal positional vertigo (BPPV). (Defs.' SOF ¶ 41.) Plaintiff does not dispute that he "was directed to practice the Epley maneuver" by Dr. Rathore. (Pl.'s Resp. ¶ 41.) Dr. Rathore's medical

records confirm that he recommended those therapies and, separately, that Plaintiff was given "Education/Instructions." (IDOC 286.)

After his appointment with Dr. Rathore, Plaintiff returned to Stateville; that same day, he saw an unidentified licensed practical nurse, and reported, "I feel okay. I had an MRI." (Defs.' SOF ¶ 42.) The nurse noted that he had a steady gait and no pain complaints. (*Id.*) On May 14, Dr. Obaisi referred Plaintiff for a facial sinuses X-ray, which came back negative for abnormal findings and showed clear sinuses. (*Id.* ¶ 43.) The referral notes that Plaintiff's history/symptoms were "vertigo like episodes." (IDOC 664.) A week later, on May 21, Plaintiff saw Dr. Obaisi, who explained Dr. Rathore's recommendations and prescribed Meclizine 12.5 mg. (*Id.* ¶ 44.) On June 3, Plaintiff was seen by a sick call nurse, and again complained of "dizziness, nausea, vomiting, tinnitus or diplopia, trouble walking, reddened of the left ear canals." (Compl. ¶ 75.)

Also on June 3, Dr. Martija saw Plaintiff for the first time. She reviewed Plaintiff's chart, the MRI results, and Dr. Rathore's neurology consult notes, and noted his dizziness and ataxia. (*Id.* ¶ 45.) Dr. Matija's medical records note that Plaintiff's "dizziness, ataxia appear[ ] to be part of a neurodegenerative process," and identify the relevant diseases as "vertigo, organic brain disease." (IDOC at 104, 365.) Plaintiff also testified that Dr. Matija informed him that he "had dementia," and that it was "possible" Dr. Brooks' dental procedure "triggered dementia." (Silva Dep. 93:3-19.) Dr. Martija increased Plaintiff's Meclizine prescription from 12.5 mg to 25 mg. (Defs.' SOF ¶ 45.) A few weeks later, on June 18, Dr. Martija referred him to physical therapy. (*Id.* ¶ 46.)

On July 23, Plaintiff was seen by a sick call nurse, and again complained of continuing dizziness, falling and injuring his head two days prior, nausea, vomiting, and difficulty walking. (Compl. ¶ 78.) Plaintiff also saw Dr. Obaisi that day, explaining that he had experienced a bout of dizziness and had fallen in his cell, and complaining of head trauma and swelling of his right facial bone. (*Id.* ¶ 79; Defs.' SOF ¶ 47.) Plaintiff also complained that his Meclizine prescription made him sleepy. (Defs.' SOF ¶ 47.) Dr. Obaisi issued medical permits for a lower bunk and

knee braces for Plaintiff, instructed him to follow up in four weeks, and referred him for a facial X-ray (which came back negative for abnormal findings). (*Id.*) This facial bone and skull X-ray was likely in response to Plaintiff's fall and subsequent head injury: the referral noted that Plaintiff's history/symptoms were "[b]lunt trauma [rule out] fracture." (IDOC 665.); www.tabers.com/tabersonline/view/Tabers-Dictionary/767492/0/Medical_Abbreviations.

On August 10, Plaintiff presented to Nurse Kammerer (first name not identified) and complained of loss of consciousness, stating he was "so dizzy still" and "black out sometimes." (IDOC at 111; Defs.' SOF ¶ 48; Pl.'s Resp. ¶ 48.) He also stated that he had stopped taking Meclizine due to its side effects. (Defs.' SOF ¶ 48.) Plaintiff reported that he had felt something in his left ear, and had used a spoon to scratch it, resulting in pain. (*Id.*) Nurse Kammerer observed that Plaintiff's left ear was irritated, but the canal was clear and there was no perforation (tearing of the ear drum). (*Id.*) Plaintiff testified that his ear "was bothering [him] so much" that day and "was getting real itchy." (Silva Dep. 102:3–5.)

Nurse Kammerer referred Plaintiff to Dr. Obaisi, who saw him the following day, August 11. (Defs.' SOF ¶¶ 48–49.) Plaintiff reported that he was out of Meclizine and, on Plaintiff's request, Dr. Obaisi renewed his prescription. (*Id.* ¶ 49.) Dr. Obaisi also noted that Plaintiff's "positional vertigo is recurring." (IDOC 113.) On September 3, Plaintiff again presented to Dr. Obaisi complaining of vertigo. (Defs.' SOF ¶ 50). Dr. Obaisi noted "no acute findings," prescribed Prednisone, instructed Plaintiff to follow up in one week, and provided a medical lay-in permit. (*Id.*) A lay-in permit is granted to inmates who "can't leave their cell because something is really wrong with them or physically they can't move around." (Silva Dep. at 24:7–13). Plaintiff's medical lay-in permits meant that staff members brought his meals directly to his cell. (*Id.* at 24:23–25:2.) When Plaintiff was seen by a nurse on September 9, he reported he was having an adverse effect to medication previously prescribed by Dr. Obaisi. (Compl. ¶ 83.) The nurse reviewed Plaintiff's chart and noted that he was finishing a course of Prednisone that day. (Ex. 1

to Compl. [1-1] (hereinafter "Ex. 1 to Compl.") at 42.)  On September 11, Plaintiff "refused to be seen in RNSC [nurse sick call] due to having a Medical Director appt coming up." [12]  (IDOC 118.)

In September, Plaintiff's symptoms briefly appeared to improve.  On September 15, 2015, he saw Jose Becerra, a physical therapist, for an evaluation and consultation.  (Defs.' SOF ¶ 52.) In medical records from that date, Becerra noted that he saw no indication "for BPPV."  (IDOC 291.).  Becerra also noted: "S + S [sign and symptoms] similar to drug-induced vestibular damage or central lesion."  (Id.)  Becerra stated that Plaintiff might benefit from eight to twelve therapy sessions for high level balance training and home exercises.  (Defs.' SOF ¶ 52.)  The medical records for Plaintiff's physical therapy session on September 22 refer to various exercises, and Plaintiff reported that he felt "a lot better."  (Id. ¶ 53; IDOC 120).  Then, on September 23, Plaintiff followed up with Dr. Obaisi for a wellness check; Dr. Obaisi noted that the Prednisone was helping Plaintiff's dizziness and equilibrium "a lot," and so he planned to keep Plaintiff on Prednisone. (Defs.' SOF ¶ 54; IDOC 120.)  Plaintiff alleged, however, that Dr. Obaisi "only order[ed] more ineffective medication" at this appointment.  (Compl. ¶ 85.)  In a physical therapy session a few days later, on September 28, Plaintiff reported that his dizziness was "a little better," and Becerra noted that Plaintiff's gait was normal.  (Defs.' SOF ¶ 55; IDOC 121.)

But on October 6, 2015, Plaintiff reported to Becerra that he was dizzy and did not feel well, and Becerra noted that his gait was unsteady.  (Defs.' SOF ¶ 56; IDOC 121.)  Becerra discharged Plaintiff, determining that further physical therapy was unlikely to provide a benefit, and directed Plaintiff to continue his exercises at home.  (Defs.' SOF ¶ 56.)  A month later, on November 9, Plaintiff presented to Dr. Martija in the general medical clinic with an unsteady and slow gait; she prescribed Meclizine and Atenolol (high blood pressure medication), gave Plaintiff

---

[12]     Plaintiff asserts that he was prevented from going to this appointment because prison officials refused to use less restrictive restraints, but his cited deposition testimony refers to his refusal to go to a 2018 appointment at UIC for this reason.  (Pl.'s Resp. ¶ 51; Silva Dep. 130:16–132:20).

a lower bunk permit, and scheduled an optometrist appointment. (*Id.* ¶ 57; IDOC 368); www.medlineplus.gov/druginfo/meds/a684031.html. Plaintiff also saw Dr. Obaisi on November 24 for skin issues; there is no mention of dizziness or vertigo in the medical records for that visit. (IDOC 122.)

### D. 2016

Plaintiff asserted in his complaint that he "was seen by medical personnel on related issues" (Compl. ¶ 87), but there are no medical records from November 2015 to March 2016. On March 17, 2016, Plaintiff was seen at nurse sick call for his continuing vertigo, and was scheduled for a follow-up with Dr. Obaisi on March 23. (*Id.* ¶ 88; Ex. 1 to Compl. at 48.) Plaintiff also told the nurse that "the Medical Director told me he's sending me to UIC but nothing happened." (Ex. 1 to Compl. at 48.) The March 23 appointment with Dr. Obaisi did not occur "due to legal call / time constraints." (*Id.*) On March 29, Plaintiff saw a sick call nurse for nasal congestion, but denied needing cold medicine. (Defs.' SOF ¶ 58.) Instead, he complained of dizziness and stated, "I just wanted to know when I am going to see the doctor." (IDOC 127.) The nurse noted that Plaintiff's March 23 appointment had been rescheduled, and Plaintiff was now scheduled to see a provider on April 6. (*Id.*) But the April 6 appointment was also canceled; the medical record states that Plaintiff was "not seen for Med. Dir Appt per security," but does not make clear what this means. (IDOC 128.) The appointment with Dr. Obaisi was rescheduled for April 14, but due to "no provider available," it was rescheduled once again to April 19. (*Id.*)

While Plaintiff's appointments were being rescheduled, he was seen by Dr. Mitchell for his yearly dental exam on April 7, and once again complained of dizziness and vertigo; it is not clear what treatment Dr. Mitchell provided. (Compl. ¶ 90, at 80). On April 19, Plaintiff finally saw Dr. Obaisi and complained of knee pain and a rash. (Defs.' SOF ¶ 59.) Dr. Obaisi discussed the results of Plaintiff's x-rays, which showed degenerative joint disease. Dr. Obaisi also noted that Plaintiff "still had occasional disequilibrium." (*Id.*) Dr. Obaisi continued Plaintiff's Meclizine prescription, prescribed Klonopin (a medication to help with Plaintiff's sleeping disorder), and

prescribed medication for the rash and knee issues. (*Id.*; Compl. ¶ 90a.) He also stated that he would refer Plaintiff for a mental health evaluation. (Pl.'s Resp. ¶ 59.) Plaintiff was seen by an unidentified mental health doctor on April 27, 2016. (Compl. ¶ 91.) A four-week follow up was noted in the medical records for this appointment. (*Id.*; Ex. 1 to Compl. at 52.) Plaintiff's medical records also state that Plaintiff saw a psychologist on July 29, and he testified that he was "in mental health" for "over a year." (IDOC 134; Silva Dep. 116:15–117:7.) There is no other record of mental health treatment.

On May 9, Plaintiff saw Dr. Martija for a physical examination. (Defs.' SOF ¶ 60). The exam noted that Plaintiff's motor strength was 4/5 in both extremities, that he walked slowly with a shuffling gait, and that he suffered from left eye ptosis, but no facial asymmetry. (*Id.*) Dr. Martija renewed Plaintiff's low bunk permit and his existing medications. (*Id.*; Martija Decl., Ex. 6 to Defs.' Mem. (hereinafter "Martija Decl.") ¶ 21.) This was the last time Dr. Martija saw Plaintiff, as she ended her employment with Wexford on July 28, 2016. (Defs.' SOF ¶ 61.) On May 26, Plaintiff was seen by PA Williams concerning other medical issues.[13] (Compl. ¶ 92.) Plaintiff told PA Williams that he was supposed to be following up with Dr. Obaisi and asked, "Why am I seeing you?" (Ex. 1 to Compl. at 53.) PA Williams rescheduled Plaintiff for a follow-up with Dr. Obaisi. (Compl. ¶ 92.)

On August 6, Plaintiff presented to Dr. Obaisi, who "confirmed" Plaintiff's medical permits and continued his Meclizine and Nasacort prescriptions. (Defs.' SOF ¶ 62.) On September 25, Plaintiff was seen by a sick call nurse for dizziness, and was referred to PA Williams for an appointment on September 28. (Compl. ¶ 93; Ex. 1 to Compl. at 54.) Plaintiff saw PA Williams on September 28 and refused a low gallery permit because the low gallery's moistness made his bones ache. (Defs.' SOF ¶ 63.) Plaintiff again complained of dizziness, was again prescribed

---

[13]     Plaintiff refers to "Nurse Practitioner L. Williams" in his complaint. (Compl. ¶ 92.) This court assumes this refers to physician's assistant ("PA") LaTanya Williams. (Defs.' SOF ¶ 14.)

Meclizine, and was again referred to Dr. Obaisi. (*Id.*) PA Williams noted that Plaintiff's dizziness and vertigo were "worsening," and that Plaintiff reported, "the Meclizine stopped working, so I stopped taking it a while ago." (IDOC 138–139.) Plaintiff also told PA Williams that Dr. Obaisi "said he was going to send me to an ENT specialist." (*Id.* at 139.)

A week later, on October 5, Plaintiff saw Dr. Obaisi. (Compl. ¶ 95.) Dr. Obaisi noted that Plaintiff's vertigo was still recurring and that he had problems walking; Dr. Obaisi also made a note about referring Plaintiff for a follow-up at UIC Neurology. (Ex. 1 to Compl. at 57.) Dr. Obaisi made the referral on October 8, and Wexford approved it on October 17. (Defs.' SOF ¶ 64.) On October 21, Plaintiff was seen by a sick call nurse; the nurse noted that Plaintiff was advised "to notify if any problems arise at any time," and that Plaintiff had an appointment scheduled for October 14. (Ex. 1 to Compl. at 59.) That appointment was rescheduled for October 24, when Plaintiff again saw PA Williams for vertigo. (*Id.*; Compl. ¶ 96.) PA Williams noted that Plaintiff's treatment plan included a forthcoming UIC appointment, patient education and reassurance, and follow-up visits. (Ex. 1 to Compl. at 58.) Three weeks later, Plaintiff saw Dr. Obaisi, again for dizziness and vertigo. (Compl. ¶ 97.) The only plan Dr. Obaisi noted in the medical records was the neurology consult. (Ex. 1 to Compl. at 62.)

### E. 2017

On March 7, 2017, approximately five months after the October 2016 neurology referral, Plaintiff saw Dr. Cathy Helgason (a neurologist) at UIC. (Defs.' SOF ¶ 64; Martija Decl. ¶ 25.) Dr. Helgason noted that Plaintiff's MRI showed atrophy in the past and that he had a history of head trauma (including a car accident prior to his time at Stateville) and "organic brain syndrome." (IDOC 293–294.) She further noted that Plaintiff has "[s]pells of loss of consciousness lasting 5–15 minutes where he is unresponsive," and a history "of dizzy spells not responding to meclizine." (IDOC 295.) Finally, Dr. Helgason noted the possibility of a seizure disorder, and recommended a trial of Keppra (a medication that treats seizures), an EEG (a test that measures the brain's electrical activity), and a follow-up in three months. (Defs.' SOF ¶ 64;

www.medlineplus.gov/ency/article/003931.html; www.medlineplus.gov/druginfo/meds/a699059. html. Although Defendants assert that Dr. Obaisi approved these recommendations, the court notes that Dr. Obaisi only signed the referral form section showing that he had reviewed the recommendations; he did not check the box noting that he approved or disapproved them. (IDOC 293.) Plaintiff's medical notes show that Plaintiff did begin taking Keppra 500 mg twice daily, and Dr. Obaisi referred Plaintiff for an EEG on March 9. (Defs.' SOF ¶ 64.) But there is no evidence that Dr. Obaisi followed Dr. Helgason's three-month follow-up recommendation: Plaintiff did not see Dr. Helgason again until December 5, about nine months later, and the referral for this follow-up is not dated or signed. (IDOC 302.) Unrelated to Plaintiff's dizziness, Dr. Obaisi referred Plaintiff to an orthopedic specialist at UIC for severe degenerative joint disease of both knees on July 24. (Def.'s SOF ¶ 65.)

On September 12, 2017, some six months after Dr. Obaisi's referral for an EEG, Plaintiff had the EEG conducted at UIC. (*Id.* ¶ 66.) Defendants note that the EEG revealed no clear evidence of any "focal or diffuse abnormality," nor evidence of "epileptiform discharges" or "discharging focus." (*Id.* ¶ 66.) Defendants do not define these terms, explain the significance of this EEG, or state whether it affected Dr. Obaisi's treatment plan, but Dr. Helgason later noted "EEG 2017 was normal." (IDOC 302.) A month later, on October 24, Plaintiff declined to be seen by a sick call nurse, stating that "I don't wanna be seen today"; he was not in acute distress at this time. (Defs.' SOF ¶ 67; IDOC 180.) Plaintiff then returned to Dr. Helgason at UIC on December 5—six months overdue for the recommended three-month follow-up from his March 7th appointment. (*Id.* ¶ 68.) Dr. Helgason again noted the past MRI showing brain atrophy and Plaintiff's family history of dementia. (IDOC 302.) She further noted: "Spells of unclear etiology described as vertigo. Partial response to meclizine in the past." (*Id.*) Dr. Helgason recommended another MRI and more labs; the medical records show a list of recommended tests (in the form of abbreviations), but the court cannot discern their meaning. (*Id.*) She also recommended that

Plaintiff stop taking Keppra, start Triamine,[14] and start a trial of Hydroxyzine (an antihistamine used to treat allergies, as well as anxiety and tension). (Id.); www.medlineplus. gov/druginfo/ meds/a682866.html. Plaintiff testified that he stopped taking Keppra because it made him sick, and that he told Dr. Helgason about these side effects. (Silva Dep. 120:1–121:7, 128:11–129:6.) The record does not make clear why Dr. Helgason chose the new medications or what condition those medications treated. Defendants assert that Dr. Obaisi approved Dr. Helgason's medications, but he again signed the referral form on December 12 without checking the "approve" box. (IDOC 302.) Plaintiff's medical records show that Wexford approved the second MRI on December 19. (Defs.' SOF ¶ 68.) This was the last time Plaintiff was under Dr. Obaisi's care; Dr. Obaisi passed away on December 23, 2017. (Id. ¶ 69.)

### F. Post-2017

Plaintiff's medical records end after December 2017, when he stopped receiving care from any of the Defendants. Plaintiff testified, however, that his symptoms persist. As of the time of his deposition, Plaintiff continues to experience dizziness, including seeing "little dots" and needing to lie down approximately two or three times a day. (Silva Dep. at 42:22–24, 70:2–3, 100:3–101:3.) He also testified that he cannot hear well in his left ear. (Id. at 42:14-17.) Plaintiff has continued issues with his gait: he cannot "control his body" (meaning his "equilibrium won't allow [him] to walk straight") and he can only "sometimes" get "from Point A to Point B in the prison." (Id. at 41:10–19.) Defendants point out that Plaintiff has "bad knees" and an appointment for a knee replacement at UIC (id. at 41:5–9), and suggests that this is the cause of his movement problems. (Defs.' Mem. at 5.) In any event, Plaintiff also testified that he takes Tylenol and Motrin

---

[14]    Triamine is "a compound containing three amino groups." www.merriam-webster.com/dictionary/triamine. It is not clear what this would treat or whether it is a medication. The court notes that Helgason may have actually written "start Thiamine" in her medical notes. (IDOC 302.) Thiamine (or Vitamin B1) treats conditions caused by lack of thiamine in the diet, including numbness and tingling in feet and hands, muscle loss, poor reflexes, memory loss, and confusion. www.medlineplus.gov/druginfo/meds/a682586.html.

for pain when necessary and that he still takes Meclizine as needed, up to three times a day. (Silva Dep. at 82:18–83:3, 137:6–11.)

The record does not make clear whether Plaintiff's use of Meclizine was consistent or continuous. Plaintiff testified at his deposition that since initially being prescribed Meclizine as needed, he always refilled the prescription and was never off Meclizine. (Silva Dep. at 76:1–11.) But he acknowledged that he stopped taking Meclizine in September 2014. (*Id.* at 88:5–13.) Nor does he dispute Defendants' assertion that on August 10, 2015, he told a nurse that he had stopped taking the medication, and then the next day requested a prescription for Meclizine from Dr. Obaisi. (Defs.' SOF ¶¶ 47–48.) As of at least 2015 and potentially earlier (Plaintiff's deposition testimony is not clear), Plaintiff's Meclizine prescription automatically re-filled when he ran out for the month. (Silva Dep. at 83:12–17.) Plaintiff makes no assertions that he was ever denied Meclizine or lacked access to Meclizine.

III. **Procedural Posture**

On February 20, 2018, Plaintiff filed suit in this court against Defendants Wexford, Obaisi, Mitchell, Brooks, and Martija. (Compl. at 2–3.) Plaintiff sued under 42 U.S.C. § 1983, bringing an Eighth Amendment claim based on deliberate indifference and claiming that Defendants "fail[ed] to medically treat the Plaintiff's serious medical needs, causing the unnecessary and wanton infliction of pain." (Compl. ¶ 1.) On April 3, 2013, the court held that Plaintiff's complaint failed to state a claim against Wexford, and dismissed Wexford from this lawsuit. (Order [5] at 4.) The court allowed Plaintiff's claims against the other Defendants to proceed, and recruited counsel to represent Plaintiff. (*Id.*)

Defendants Obaisi, Martija, and Brooks now move for summary judgment [64]. Defendant Mitchell, represented by different counsel, also moves for summary judgment [81]. In response to these motions, Plaintiff argues that his claim survives under a variety of theories. With respect to Drs. Obaisi and Martija, Plaintiff argues that they persisted in ineffective treatment, delayed or failed to facilitate specialist visits, and ignored his medical diagnoses. (Pl.'s Mem. at 8–9.) He

contends that Dr. Mitchell provided inadequate care and ignored his complaints, and that Dr. Brooks performed a deliberately indifferent dental procedure. (*Id.* at 9–10; Pl.'s Mem. to Mitchell at 4–6.) The court addresses these claims below.

## DISCUSSION

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). When considering the evidence, the court construes all facts and draws all inferences in the light most favorable to the nonmovant. *Id.*

### I.    Local Rule 56.1

Before turning to the merits, the court addresses Plaintiff's compliance with Local Rule 56.1. Defendants spend a significant portion of their reply brief urging the court to strike Plaintiff's brief in opposition to summary judgment and response to Defendants' Rule 56.1 statement of facts. (Defs.' Reply Br. in Supp. of Mot. for Summ. J. [80] (hereinafter "Defs.' Reply") at 2–7.) Defendants correctly point out that Plaintiff's brief in opposition did not comply with Local Rule 56.1. Rather than filing a statement of additional facts, *see* N.D. Ill. L.R. 56.1(b)(3), Plaintiff asserted additional facts in his brief. (*See generally* Pl.'s Mem.) Moreover, Plaintiff cited directly to the record, rather than citing to the parties' statements or responses; this "has long and repeatedly been held" to "violate[] Local Rule 56.1." *Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 719 (N.D. Ill. 2014) (collecting cases). The court does not endorse Plaintiff's failure to comply with Rule 56.1, but is not required to enforce the rule strictly. *Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 949 (N.D. Ill. 2014) (explaining that district courts may "exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of

local rules by district judges") (quoting *Modrowski v. Pigatto,* 712 F.3d 1166, 1169 (7th Cir. 2013)). The court declines to disregard Plaintiff's assertions, at least to the extent that they are supported by admissible record evidence.

Defendants also contest Plaintiff's response to their Rule 56.1 statement, raising several different grounds for striking his responses. First, Defendants seek to strike Plaintiff's responses that rely on his complaint. Though a non-moving party may not ordinarily rest on the pleadings at summary judgment, *see, e.g., Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017), Plaintiff verified his complaint under oath and penalty of perjury. (Compl. at 43.) His complaint allegations are therefore "the equivalent of an affidavit for summary judgment purposes," and are admissible insofar as they comply with affidavit requirements, including the personal knowledge requirement. *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *see also Johnson v. City of Kankakee*, 260 F. App'x 922, 924 (7th Cir. 2008). Second, Defendants argue that Plaintiff's responses are argumentative and immaterial. It is not clear what responses Defendants seek to strike on this basis.[15] Regardless, in deciding Defendants' summary judgment motion, the court will consider only material factual assertions supported by admissible evidence. This includes Plaintiff's responses that validly dispute a portion of Defendant's statement of fact with evidence from the record, though the remaining assertions are deemed admitted. *See* N.D. Ill. L.R. 56.1(e)(3).

---

[15]     Rather than identifying which of Plaintiff's 34 material responses they seek to strike, Defendants simply claim there are "countless" improper responses. (Defs.' Reply at 6.) Though Defendants provide examples of allegedly improper responses, several of these do not prove their point. For instance, Defendants contest Plaintiff's responses to their SOF ¶¶ 12–13 as being argumentative or immaterial. These statements describe Plaintiff's September 24, 2010 medical appointments, during which Plaintiff complained of dizziness. (Defs.' SOF ¶¶ 12–13.) Plaintiff disputed Defendants' statements as "incomplete," and added—with proper citation to the record—that the September 2010 dizziness symptoms had a different cause and were less severe than his current dizziness. (Pl.'s Resp. ¶ 12–13.) As Defendants point to this September 2010 dizziness in their merits argument, their contention that Plaintiff's response is argumentative or immaterial rings hollow. (Defs.' Mem. at 7.)

Finally, Defendants ask the court to strike any response disputing medical facts with lay opinion. Under the Federal Rules of Evidence, a lay witness may not offer medical opinions based on "scientific, technical, or other specialized knowledge." *Johnson v. Obaisi*, No. 16 CV 4046, 2020 WL 433872, at *4 (N.D. Ill. Jan. 28, 2020); *see* FED. R. EVID. 701. Opinions that necessitate such knowledge—including medical diagnoses or the cause of symptoms—generally require expert testimony. *Id.*; *see Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995). But a lay witness is free to offer opinions rationally based on his own perception, including perceptions of his pain and physical health. *Haack v. Bongiorno*, No. 08 C 02488, 2011 WL 862239, at *3–4 (N.D. Ill. Mar. 4, 2011). Thus, the court disregards Plaintiff's lay testimony on medical causation, but will consider Plaintiff's description of his health, symptoms, and pain. The court now considers the merits of Plaintiff's Eighth Amendment claim.

## II.  Eighth Amendment

The Eighth Amendment requires the government to provide "medical care for those whom it is punishing by incarceration." *Davis v. Kayira*, 938 F.3d 910, 914 (7th Cir. 2019) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). An Eighth Amendment claim against a prison healthcare provider for violating this right has two requirements: first, that the plaintiff "suffered from an objectively serious medical condition," and second, that the defendant was "deliberately indifferent to that condition." *Id.* (*Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016)).

A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Additionally, an inmate has a serious medical need where lack of treatment "could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997)). More expert analysis from both sides would be helpful in this case, but the court is satisfied that Plaintiff meets this standard. Though Defendants attempt to minimize Plaintiff's symptoms (characterizing them as

"inconvenient" and "subjectively-reported"), this misinterprets the record. (Defs.' Mem at 4.) Plaintiff suffered from years of severe dizziness, vertigo, problems walking, and other symptoms—symptoms serious enough to require multiple specialist referrals and transfer to a hospital. Defendants point to no Seventh Circuit precedent suggesting that this does not meet the standard for a serious medical condition. Instead, Defendants offer several out-of-circuit district court opinions; these cases are not persuasive, as none contained evidence of symptoms as significant, extensive, or well-documented as Plaintiff's. [16] Defendants also note that Plaintiff could perform "usual day to day activities on his own" (such as reading, eating, and walking without a cane), and that he did not have an official diagnosis of dementia or Meniere's disease— which, the court observes, could be a result of Defendants' own failure to make a specialist referral. (Defs.' Mem. at 5–6.) In any event, the court cannot discern how these facts alter its conclusion that Plaintiff's symptoms were objectively serious, and Defendants offer no legal authority clarifying the issue. Plaintiff has raised a genuine question as to the first prong of his Eighth Amendment claim.

The second prong is the "deliberate-indifference standard," which "requires a 'sufficiently culpable state of mind.'" *Davis*, 938 F.3d at 914 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To prove subjective culpability, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (emphasis in original). When a prison official "ignore[s] a request for medical assistance," this standard is

---

[16]      In fact, none of the cases analyze plaintiff's evidence (or lack thereof) relating to his vertigo. *See McClain v. Arnold*, No. C 06-03834 JF (PR), 2008 WL 4155675, at *3 (N.D. Cal. Sept. 5, 2008) (granting summary judgment where plaintiff did not file an opposition, his complaint allegations could not be treated as an affidavit, and he merely alleged that he suffers from vertigo and paralysis); *Leonard v. Denny*, No. 2:12-cv-00915-TLN-AC-P, 2020 WL 5039065, at *12 (E.D. Cal. Aug. 26, 2020) (briefly concluding that mold in plaintiff's cell was not a serious medical need because there was no evidence it was harmful to his allergies, asthma, or vertigo); *Febus v. CCS Correct Care Sols.*, No. 17 CV 3408 (VB), 2018 WL 4112818, at *4 n.3 (S.D.N.Y. Aug. 29, 2018) (mentioning in a footnote that conclusory allegations of vertigo and other ailments did not state a claim).

obviously met. *Id.* And when officials do provide some medical treatment, that may not mean that they have provided constitutionally acceptable treatment. A jury may infer subjective culpability from certain treatment decisions, including "persist[ing] in a course of treatment known to be ineffective," "choos[ing] an easier and less efficacious treatment without exercising professional judgment," or "refus[ing] to take instructions from a specialist." *Id.* at 730 (citations and quotation marks omitted). In some cases, a plaintiff may also point to the failure to authorize a visit to a specialist, or a delay in granting a specialist visit. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014); *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021). Moreover, *any* "inexplicable delay in treatment which serves no penological interest" may establish deliberate indifference. *Thomas*, 991 F.3d at 769 (quoting *Petties*, 836 F.3d at 730). When considering delayed treatment, courts ask "how serious the condition in question was, how easy it would have been to treat it, and whether it exacerbated an injury or unnecessarily prolonged pain." *Id.* The plaintiff may also require independent evidence that the delay (not just the underlying condition) harmed him. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

For claims of inadequate treatment, the Seventh Circuit has repeatedly "emphasized the deference owed to the professional judgment of medical personnel." *Zaya*, 836 F.3d at 805. Decisions involving the "exercise of medical discretion"—including the decision to refer a prisoner to a specialist—evince deliberate indifference only if they are "blatantly inappropriate." *Pyles*, 771 F.3d at 411 (quoting *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011)). It is not enough that a prisoner disagrees with his doctor about the proper course of treatment, or even that another medical professional disagrees; the decision must be "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.* at 409, 411.

The court considers each Defendant's medical treatment of Plaintiff below, and concludes that Plaintiff raised a genuine question as to Dr. Obaisi's subjective culpability, but not the other individual Defendants.

27

III.  **Individual Defendants**

  A.  **Dr. Obaisi**

Plaintiff argues that Dr. Obaisi persisted in years-long ineffective treatment (namely, prescriptions for Meclizine and painkillers) for his vertigo-related symptoms and potential diagnoses (labyrinthitis or Meniere's disease and organic brain syndrome or dementia).  (Pl.'s Mem. at 8.)  Defendants, on the other hand, dispute that Plaintiff was ever diagnosed with these conditions, and argue that Dr. Obaisi nonetheless responded to Plaintiff's symptoms with varied and changing medical treatments.  (Defs.' Reply at 8; Defs.' Mem. at 11–12.)  Plaintiff identifies several specific circumstances that he believes support his deliberate indifference claim against Dr. Obaisi: delaying Plaintiff's MRI, failing to adequately treat his neurological issues, ignoring Dr. Patel's diagnosis of labyrinthitis or Meniere's disease, and declining to refer Plaintiff to an ENT specialist.  (Pl.'s Mem. at 6–8.)  On this record, the court concludes that Plaintiff has raised a genuine question as to whether Dr. Obaisi was deliberately indifferent.

Dr. Obaisi's treatment of Plaintiff is punctuated with unexplained delays.  When Plaintiff first saw Dr. Obaisi on September 16, 2013, several months after his dental procedure with Dr. Brooks, Plaintiff had symptoms of dizziness, which had resulted in several falls and the inability to stand or walk for long periods.  (Pl.'s Resp. ¶ 25.)  Despite knowing of these symptoms, Dr. Obaisi did not see Plaintiff again for seven months, during which time Plaintiff repeatedly complained of dizziness, vertigo, and related symptoms to other Stateville medical professionals. (Defs.' SOF ¶¶ 26–33; Compl. ¶¶ 56–57.)  By the time Dr. Obaisi saw him next, on April 4, 2014, Plaintiff's symptoms had significantly worsened, leading Dr. Obaisi to transfer him to St. Joseph's Medical Center for an emergency evaluation.  (Pl.'s Resp. ¶ 33.)  There, Dr. Patel prescribed Meclizine and other medication, gave neurology and ENT referrals, and noted that Plaintiff's symptoms seemed consistent with labyrinthitis or Meniere's disease (inner ear disorders).  (*Id.* ¶ 34; Defs.' SOF ¶ 34.)  Despite these symptoms and Dr. Patel's recommendations, Dr. Obaisi never made an ENT referral, and there were significant delays in his neurology referrals.  Both of

these circumstances permit an inference of deliberate indifference. The decision to send a prisoner to a specialist is a matter of medical discretion, meaning that failure to do so is significant only if blatantly inappropriate. *See Pyles*, 771 F.3d at 411. This is especially true for the "failure to seek a particular diagnostic technique," like an MRI, which typically amounts only to "medical malpractice." *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916 (7th Cir. 2020) (citing *Estelle*, 429 U.S. at 107). Nonetheless, "in the face of a known need for specialist treatment," even a "brief" delay may support deliberate indifference. *Thomas*, 991 F.3d at 767, 769.

The delays here were more than "brief." After Dr. Patel's recommendation on April 4, 2014, Dr. Obaisi made an MRI referral on April 28, 2014; Dr. Obaisi only made a neurology consultation referral on October 1, 2014 after Plaintiff persisted in complaining of his symptoms (complaints that he had consistently voiced since September 2013). (Defs. SOF ¶¶ 36, 38.) A reasonable jury could conclude that Dr. Obaisi was aware of the need for specialist treatment and diagnostic testing as early as April 2014, and certainly by October 1. Despite this, Plaintiff did not receive an MRI until December 11, 2014. (*Id.* ¶ 39.) More significantly, there is no evidence that any treating physician reviewed Plaintiff's MRI results to diagnose his condition or alter his treatment until May 13, 2015, when Plaintiff was seen by Dr. Rathore (a UIC neurologist). (*Id.* ¶ 41.) Defendants offer no reason—medical or otherwise—for this months-long delay. Wexford approved the MRI referral on May 5, 2014, and the record does not make clear when it approved the neurology consult. (*Id.* ¶ 36.) While Dr. Obaisi had not yet received Plaintiff's MRI results on December 22, 2014 (*id.* ¶ 40), Defendants decline to clarify whether Dr. Obaisi received the results in the five months before Plaintiff saw Dr. Rathore. Nor do Defendants explain whether Dr. Obaisi did anything to facilitate the MRI results or UIC consultation. *Cf. Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (affirming summary judgment for doctor-defendant where he offered a medical reason for delaying plaintiff's specialist treatment and evidence that he "did what he could within the limits of his role to move the ball forward" for scheduling specialist appointments).

As noted, neither side has presented analysis from an independent expert. Defendants argue that Plaintiff's failure to do so dooms any claim that the delayed treatment harmed him. (Defs.' Mem. at 9–10.) Without expert testimony, Defendants contend, Plaintiff lacks any "verifying medical evidence" and "relies exclusively" on his own opinions. (*Id*. at 10.) While an inmate may rely on expert testimony to prove that delay was harmful, he may also rely on any independent evidence, such as medical records, showing "that the delay exacerbated the injury *or* unnecessarily prolonged pain." *Thomas*, 991 F.3d at 771 (quoting *Petties*, 836 F.3d at 730–31). In *Thomas*, which the parties do not cite, plaintiff satisfied this by pointing out that defendant's delayed referral, in addition to exacerbating plaintiff's hand injury, prolonged his pain by delaying the orthopedist's treatment plan (splinting his hand and physical therapy). *Id*. Plaintiff's medical records similarly create a triable issue on whether delayed access to a specialist "unnecessarily prolonged his pain while he was waiting for the [neurologist]'s treatment plan." *Id*. Though Dr. Rathore's plan was similar to Dr. Obaisi's, it was not identical: both recommended Meclizine, but Dr. Rathore also recommended vestibular therapy or Epley maneuver. (Defs.' SOF ¶ 41.) Dr. Martija (not Dr. Obaisi) eventually referred Plaintiff to physical therapy on June 3, 2015 (therapy which Plaintiff did not receive until September 2015). (*Id*. ¶¶ 45, 52.) The record does not make clear whether any Defendant, including Dr. Obaisi, specifically facilitated Epley maneuver, either in physical therapy or (assuming Dr. Rathore told Plaintiff how to perform the maneuver) by directing Plaintiff to self-perform it.

Putting aside Dr. Rathore's treatment plan, there is other independent evidence from which a jury could conclude that the delayed referrals prolonged Plaintiff's pain: it delayed a proper diagnosis for the cause of Plaintiff's symptoms. As Defendants point out, Dr. Rathore "determined that there [were] no clinical signs of dementia, other neurological symptoms, or differential diagnosis." (Defs.' Reply at 8.) If Dr. Obaisi disagreed with Dr. Rathore's assessment and believed that Plaintiff had a neurological condition, Defendants offer no reason why he waited until October 8, 2016 to refer Plaintiff for a follow-up neurology consultation, nor why Plaintiff did

not see another neurologist until March 7, 2017—almost two years after Plaintiff's original consultation. (Defs.' SOF ¶ 64.) And if Dr. Obaisi agreed with Dr. Rathore and believed that Plaintiff did not have a neurological condition, it is not clear why he failed to refer Plaintiff to an ENT specialist. All the while, Plaintiff continued to experience symptoms, which were not resolved by either Meclizine or physical therapy. From this, and from the second neurologist's (Dr. Helgason) treatment plan, a reasonable jury could conclude the delay in the initial and the follow-up neurology consultation harmed Plaintiff. When Plaintiff finally saw Dr. Helgason, she noted the possibility of a seizure disorder and prescribed anti-seizure medication. (*Id.*) Then, at Plaintiff's next follow-up (which was supposed to be a three-month follow-up, but which inexplicably did not occur for nine months), Dr. Helgason again changed Plaintiff's medication, perhaps because of side effects. (*Id.* ¶ 68.) Plaintiff's medical records stop shortly after the second neurology appointment, and he testified that he continues to experience symptoms. But even if Dr. Helgason's diagnosis was ultimately incorrect or her treatment plan not successful, a reasonable jury could conclude that the two-year delay in referring Plaintiff for a follow-up, as well as the six-month delay in following Dr. Rathore's recommendation for a three-month follow-up, delayed ruling out different neurological diagnoses.

Given Plaintiff's continued symptoms and the unclear results from his neurological referrals, Defendants also offer no explanation for Dr. Obaisi's failure to consider the clear alternative: an ENT specialist. *See Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010) (reversing summary judgment for defendant where, in response to severe and unexplained tooth pain, she "rejected the obvious alternative of referring [prisoner] to a dentist"). This is especially true as Dr. Patel recommended an ENT referral and noted the potential of labyrinthitis and Meniere's disease—both disorders of the inner ear. *Compare Pyles*, 771 F.3d at 412 (affirming summary judgment where doctor declined to order an MRI or refer plaintiff to specialist for back pain because "there was no prior indication of a potentially serious long-term medical issue"), *with Greeno*, 414 F.3d at 655 (reversing summary judgment where the possibility of an ulcer was noted

in plaintiff's medical file, plaintiff continued to complain that his medication was not helping his heartburn, and defendant refused to send him to a specialist). Mere disagreement with Dr. Patel's recommendation or assessment would not establish that Dr. Obaisi's medical care substantially departed from professional standards, *see Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012), but here the record does not make clear whether Dr. Obaisi's failure to send Plaintiff to an ENT was a reasoned medical decision. Instead, the record shows that after his neurology consultation delivered (at most) uncertain results, Plaintiff continued to complain of vertigo and dizziness despite Meclizine, all while the possibility of inner ear disorders were noted in Plaintiff's medical records. This raises a genuine question as to deliberate indifference. *See Greeno*, 414 F.3d at 655.

Despite these instances of delayed or denied treatment, Defendants argue that Plaintiff's claim cannot succeed because he lacks medical evidence "criticizing [his] medical care." (Defs.' Mem. at 7–9.) Defendants are correct that Plaintiff has not provided expert testimony on summary judgment.[17] (Defs.' Mem. at 7.) But as already discussed, the record contains verifying medical evidence sufficient to create a triable issue on whether the delays in treatment harmed Plaintiff. Considering Plaintiff's four years of unexplained symptoms, Defendants' cases, cited to argue that he lacks verifying evidence, are distinguishable. *See, e.g.*, *Jackson v. Pollion*, 733 F.3d 786, 789–90 (7th Cir. 2013) (holding that there was no evidence that a three-week delay in giving plaintiff medication for slightly elevated blood pressure harmed him); *Lyons v. Aguinaldo*, No. 15-CV-4668, 2018 WL 3861546, at *5 (N.D. Ill. Aug. 14, 2018) (finding no deliberate indifference where, over a seven-month period, defendants prescribed medication to alleviate hemorrhoids

---

[17] Plaintiff notes that the court has not yet set any deadlines for expert discovery or disclosure. (Pl.'s Mem. at 7.) Although the absence of expert testimony does not, in this case, require summary judgment in favor of Defendants, the case is a close one, and the court is uncertain why Plaintiff did not, in response to Defendants' summary judgment motion, file a Rule 56(d) motion and affidavit "explaining why the additional discovery is necessary." *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006).

symptoms and plaintiff received surgery only a month after his request). And while expert testimony is certainly helpful in determining whether medical care substantially departed from professional norms, it is not required. Where a complicated medical issue requires specialized expertise to enable a layperson to "understand the various implications of a particular course of treatment," an inmate *may* rely on expert testimony. *Petties*, 836 F.3d at 729. Or he may point to circumstances that suggest a doctor has departed from "the permissible bounds of competent medical judgment" and "crosse[d] the threshold into deliberate indifference"; these circumstances include inexplicably delaying treatment, knowingly persisting in ineffective treatment, or choosing an easier but less effective course of treatment. *Id.* at 729–30.

A reasonable jury could conclude that Plaintiff's years-long medical records demonstrate these circumstances, and could infer that Dr. Obaisi substantially departed from professional norms. This evidence distinguishes the cases Defendants rely upon where the inmate pointed only to his own "self-serving opinion" or disagreement with the medical care provided. (Defs.' Mem. at 7–8.); *see, e.g.*, *Walker v. Zunker*, 30 F. App'x 625, 626–28 (7th Cir. 2002) (plaintiff's only evidence of inadequate treatment of his arthritis was his dissatisfaction about defendants denying his request for an egg-crate mattress and single cell). Though Defendants offer their own medical testimony about Dr. Obaisi's care, that does not entitle them to judgment as a matter of law; they provide only conclusory statements from Dr. Martija that Dr. Obaisi's treatment met the applicable standard of care and that his referrals were timely. (Martija Decl. ¶¶ 28–30; *see Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008) ("A reasonable jury could disregard [an expert witness's and a treating physician's] conclusory standard-of-care opinions and instead rely on other evidence in the record to conclude that [defendant] acted with deliberate indifference to [plaintiff]'s serious medical needs.").

Finally, Defendants argue that, no matter Plaintiff's "self-serving factual highlights," Stateville professionals provided an "incredible amount of treatment" to Plaintiff, and therefore no individual Defendant can be liable for deliberate indifference. (Defs.' Mem. at 9, 11–12.) Though

the court considers the totality of an inmate's care, *see Walker*, 940 F.3d at 965–66, that does not change the outcome. Dr. Obaisi's failure to refer Plaintiff to an ENT and the months-long delay in Plaintiff receiving an MRI or seeing a neurologist (and the years-long delay in following up with a neurologist) were not merely "isolated incidents of neglect." *See Gutierrez*, 111 F.3d at 1374–75 (affirming dismissal where, over a ten-month period of otherwise prompt treatment for his infected cyst, plaintiff alleged a small number of delays ranging from four to fourteen days). The court is also skeptical that Dr. Obaisi's other treatment reflected a "comprehensive and dynamic" plan. (Defs.' Mem. at 11.) Besides the delayed neurological diagnostics, Dr. Obaisi ordered one set of diagnostic labs (for venereal diseases, according to Plaintiff) and two facial X-rays (at least one of which appeared to check for fractures from a recent fall, not vertigo conditions). (Defs.' SOF ¶¶ 25, 43, 47; Compl. ¶ 52; IDOC 665.) Defendants offer no testimony (including from Dr. Martija's declaration) explaining how these decisions were "geared toward" diagnosing and effectively treating Plaintiff's underlying condition. (Defs.' Mem. at 11.)

While Defendants hang their hat on Dr. Obaisi's continued prescription of Meclizine, a reasonable jury could find this to reflect a decision on the part of the doctor to follow an "easier and less efficacious treatment" of using medication to treat Plaintiff's symptoms, rather than uncovering the cause of those symptoms. *See Berry*, 604 F.3d at 441 (quoting *Estelle,* 429 U.S. at 104 n.10). This is especially true given Plaintiff's continued claims that Meclizine either did not or only somewhat helped, and his problems with its side effects. Given these complaints (and Dr. Obaisi's lack of response to the complaints), the fact that Plaintiff occasionally discontinued Meclizine due to side effects does not entitle Defendants to summary judgment. (Defs.' Mem. at 12.) Nor does the fact that other doctors recommended Meclizine. A reasonable jury could conclude that these physicians were attempting to treat Plaintiff's symptoms while awaiting a diagnosis; Dr. Patel, for instance, also recommended specialist referrals. And Dr. Rathore (who noted that Plaintiff's dizzy spells only partially responded to Meclizine) did not recommend

Meclizine at all, instead prescribing anti-seizure medication and then a different antihistamine. (IDOC 294, 302.)

Most significantly, no other physician besides Dr. Obaisi treated Plaintiff over a period of four years, listened to Plaintiff's numerous complaints, and nonetheless persisted a treatment plan focused on Meclizine. Contrary to Defendants' assertion, this years-long course of treatment is not just "a difference of medical opinion." *Murphy*, 962 F.3d at 915–16 (affirming summary judgment where defendant waited five days to send plaintiff to a hospital for a swollen, infected cheek and plaintiff's expert would have transferred him earlier). Nor do Plaintiff's complaints with his treatment resemble the out-of-circuit district court opinions that Defendants rely upon. *See Triplett v. Banks*, No. 1:17CV65-RHW, 2019 WL 2092568, at *2–3 (S.D. Miss. May 13, 2019) (plaintiff took issue with the month-long delay in receiving an antibiotic for his sinus condition and admitted to twice receiving brand-name Meclizine during that month); *Franklin v. Abston*, No. 7:09-CV-01340-LSC, 2011 WL 13286474, at *8 (N.D. Ala. Mar. 15, 2011) (plaintiff took issue with defendants' provision of over-the-counter, generic Meclizine rather than prescription-strength). Defendants additionally point to Plaintiff's other treatment, including his Prednisone prescription, occasional medical lay-in permits, and a few weeks of physical therapy (Defs.' Mem. at 2), but a reasonable jury could conclude that this treatment, too, was focused only taking the edge off Plaintiff's symptoms, rather than a diagnosis or effective treatment.

Defendants are correct that the fact that Plaintiff continues to experience symptoms does not "carry the day"; prison officials are not liable when they respond "reasonably," even if "the harm ultimately was not averted." (*Id.* at 8 (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).) Nevertheless, for the reasons already detailed, a reasonable jury could fault Dr. Obaisi for his response, not just the resulting harm. Summary judgment as to Defendant Obaisi is denied.

### B. Dr. Martija

Plaintiff's arguments against Dr. Martija mirror his arguments against Dr. Obaisi—but Dr. Martija was much less involved in his medical care. Before Dr. Martija left Wexford on July 28, 2016, Plaintiff saw her at the general medical clinic three times, starting on June 3, 2015. (Defs.' SOF ¶¶ 45–46, 57, 60–61.) Dr. Martija cannot be liable for any delays or inadequate treatment before that date, including the delayed MRI and neurology consultation. Given Dr. Martija's limited involvement in Plaintiff's care after that date, the court grants summary judgment as to Plaintiff's claims against her.

Plaintiff argues that Dr. Martija failed to treat his organic brain syndrome and dementia, but this lacks support in the record. (Pl.'s Mem. at 9.) When Dr. Martija met with Plaintiff on June 3, he had severe symptoms: he had "almost passed out" (Compl. ¶ 75) and was "wheeled to health care" by a medical technician. (Silva Dep. 30:16–31:6.) There, Dr. Martija reviewed Plaintiff's chart, MRI results, and Dr. Rathore's neurology consultation notes. (Defs.' SOF ¶ 45; IDOC 105.) Dr. Martija told Plaintiff that he had dementia, and her medical notes state that Plaintiff's "dizziness, ataxia, appears to be part of a neurodegenerative process," and that he suffered from "vertigo, organic brain disease." (Silva Dep. 93:3-19; IDOC 104, 365.) She also noted "[w]ill manage symptoms as they emerge." (IDOC 366.) Dr. Martija increased Plaintiff's Meclizine, and a few weeks later, on June 18, 2015, referred him to physical therapy; the rationale for her referral was "uncoordinated [ ] to neurologic disorder, for conditioning." (Defs.' SOF ¶¶ 45–46; IDOC 291.) Plaintiff saw Dr. Martija again on November 9, 2015, and May 9, 2016, but did not exhibit severe symptoms either time; on one of these occasions, he told Dr. Martija that he was "still feeling the same."[18] (Silva Dep. 32:9–13.) On November 9, Plaintiff had an unsteady,

---

[18]     Plaintiff testified that he only saw Dr. Martija two times, but that is contradicted by the medical records. (Silva Dep. 92:17–18.) He also testified that he had significant symptoms on June 3, when he was "wheeled" to the health care unit to see Dr. Martija; as the court reads the record, his testimony that he "came in there pretty bad, barely walked over there, [and] had to

slow gait, ptosis in the left eye, and a diagnosis of organic brain syndrome; Dr. Martija prescribed Meclizine, high blood pressure medication, a lower bunk permit, and an optometrist appointment. (Defs.' SOF ¶ 57; IDOC 367–368.)  When Plaintiff next saw Dr. Martija in May, he had similar symptoms (left eye ptosis, slow and shuffling gait, and 4/5 motor strength).  (Defs.' SOF ¶ 60.) Dr. Martija noted that Plaintiff had a "progressively deteriorating neurologic disorder," and renewed his lower bunk permit and existing medications.  (IDOC 373–374.)

This record contains ample evidence that Dr. Martija believed a neurological condition caused Plaintiff's vertigo symptoms; contrary to Plaintiff's claim, however, it also shows that Dr. Martija treated this condition by managing symptoms as they emerged.  Plaintiff points to no evidence that this tactic is *blatantly* inappropriate for treating a neurodegenerative condition, at least when it occurs on only three isolated occasions over nearly a year. When Plaintiff presented with severe symptoms, Dr. Martija increased his Meclizine dosage, and she provided other treatments for different symptoms.  While there is no evidence that Dr. Martija or Dr. Obaisi specifically facilitated the Epley maneuver (recommended by Dr. Rathore), Dr. Martija referred Plaintiff to physical therapy for exercises to treat his dizziness two weeks after she saw him. Moreover, the evidence demonstrates that Dr. Martija believed Plaintiff suffered from a neurodegenerative condition—not benign positional vertigo, which (according to Defendants) is the condition that the Epley maneuver treats.  (Defs.' SOF ¶ 41.)  To the extent Dr. Martija's treatment or diagnoses departed from Dr. Rathore's specialist opinion, the decisions appear to be based in her medical judgment, and Plaintiff offers no evidence that she substantially departed from medical norms.  *See Davis*, 938 F.3d at 915–16 (affirming summary judgment where doctor incorrectly diagnosed plaintiff but there was no evidence or expert testimony indicating "he clearly should have known better"); *Whiting*, 839 F.3d at 663–64 (same).

---

hold onto the walls," refers to that date, not any follow-up appointment. (*Id.* at 30:16–31:6, 33:7–11).

Plaintiff's argument that Dr. Martija persisted in an ineffective treatment of medication similarly falls short, as the record does not support that Dr. Martija simply chose an easier path, rather than attempting to uncover Plaintiff's underlying condition. Unlike Dr. Obaisi, who consistently relied on Meclizine despite Plaintiff's continued symptoms over the course of four years, there is limited evidence that Dr. Martija knew the "extent of [Plaintiff]'s suffering or persistent complaints and requests for a new course of treatment." *Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020). There is just a note in his medical records for June 3 stating "[c]hart reviewed." (IDOC 104.) Similarly, given the limited evidence that Dr. Martija knew of Plaintiff's possible inner ear disorders and her apparent belief about the neurological cause of Plaintiff's symptoms, Dr. Martija's failure to refer him to an ENT or treat him for Meniere's disease or labyrinthitis cannot support Plaintiff's claim against her. Even if "the record may support a finding that [Dr. Martija] was aware" of these issues, there is not "evidence permitting an inference that [she] responded with deliberate indifference." *Goodloe*, 947 F.3d at 1032 (holding that defendant's "role and knowledge was too limited to create a jury question" where he only consulted with the treating physician about care decisions on three occasions).

Summary judgment as to Plaintiff's claim against Defendant Martija is granted.

## C. Dr. Mitchell

Dr. Mitchell also had a smaller role in Plaintiff's medical care. According to Plaintiff, he saw Dr. Mitchell for on four occasions: twice in 2013, once in 2014, and once in 2016. (Pl.'s Mem. to Mitchell at 5–6.) Plaintiff argues that on these occasions, Dr. Mitchell either ignored his serious medical condition or failed to provide adequate (or, on some occasions, any) medical care. (*Id.*) The court considers each of these interactions and concludes that the totality of Dr. Mitchell's medical care could not support a finding of deliberate indifference: there is no evidence that she knew of and disregarded a substantial risk of harm.

The first interaction is easily disposed of, because Dr. Mitchell had no subjective knowledge of a serious medical condition. Dr. Mitchell was in the room when Dr. Brooks

performed the cavity filling on July 19, 2013, but she was working on another patient and "had nothing to do with" the procedure. (Pl.'s Resp. to Michell ¶ 5.) Plaintiff offers no evidence that he communicated his pain to Dr. Brooks loudly and clearly enough that Dr. Mitchell could hear. Plaintiff's appointment with Dr. Mitchell on October 18, 2013 presents a closer question, but still does not evince deliberate indifference. Plaintiff asserts that he was seen by Dr. Mitchell to examine a recent filling; though he communicated the injury caused by Dr. Brooks and "resulting pain being experienced by Plaintiff," Dr. Mitchell took no action.[19] (Pl.'s Resp. to Michell ¶ 6.) Plaintiff points to three pieces of evidence in support of his assertion. His deposition testimony states:

> Q.   So you were pointing to the right side of your mouth when you said you went for a filling. My question is: When you went to see Dr. Mitchell on October 18th of 2013, did it have anything to do with the treatment that you received from Dr. Brooks on July 19th?
> A.   No, no. She did a [cavity] re-fill, I think, on my right side. But she asked me how I was feeling, and I told her, hey, this man really messed me up.
> Q.   What was her response?
> A.   She didn't say nothing else.
> Q.   What did you want her to do at that time?
> A.   Man, to send me out or send me to see another doctor or something like that.

---

[19]   Though Dr. Mitchell's version of the October 18th appointment differs from Plaintiff's account, her cited evidence does not clarify what occurred. She contends that Plaintiff presented for a refill of a previous cavity filling, he complained about feeling dizzy, and she referred him to Dr. Obaisi. (Def. Mitchell's SOF ¶ 6.) But she cites to Plaintiff's testimony that on October 18, he complained about Dr. Brooks' treatment and she did nothing further; this supports *Plaintiff's* account, not hers. (Silva Dep. 146:23–147:3.) She also cites to the following testimony from Plaintiff: "I went a couple times for a filling or a cleaning check and I asked her [about the issue with Dr. Brooks]. One time I went over there and I was getting really dizzy and sick. She just told me to go see Dr. Obaisi, I think." (Silva Dep. 149:20–24.) This is not specific to the October 18 appointment, and the parties agree that Dr. Mitchell referred Plaintiff to Dr. Obaisi on July 16, 2014. Construing the facts in favor of Plaintiff, this deposition testimony only demonstrates that Dr. Mitchell referred Plaintiff to Dr. Obaisi one time, and that was not on October 18. Because Dr. Mitchell maintained in her reply brief that she referred Plaintiff to Dr. Obaisi, her briefing does not address Plaintiff's legal arguments about whether failing to do so constitutes deliberate indifference.

(Silva Dep. 148:5-18.)  He also cites to his dental records (Compl. at 78; IDOC 339),[20] and a complaint allegation, which states that Dr. Mitchell "examines the plaintiff['s] recently filled teeth, during the examination, the plaintiff asserts the incident which occurred with [Dr.] Brooks and the medical effects of this dentist's procedure that caused pain, no further medical treatment ordered." (Compl. ¶ 53.a).  To the best of the court's reading, a portion of the dental records for October 18 state: "Pt fill # 16 + 15 are okay."  (IDOC 339.)

　　　　Although ignoring a request for medical attention or a substantial risk of medical harm can support a deliberate indifference claim, *see Petties*, 836 F.3d at 729, Plaintiff's evidence does not create a triable question regarding the October 18th appointment.  Even construing the facts in favor of Plaintiff, Dr. Mitchell took action to determine whether the recent cavity fillings established a serious medical problem—just not the action Plaintiff wanted (a referral to a doctor). Though Plaintiff testified that Dr. Mitchell "didn't say nothing" in response to his complaints (Silva Dep. 148:15), his complaint alleges that Dr. Mitchell "examined his recently filled teeth," (Compl. ¶ 53.a), and his dental records state that fillings # 15 and 16 (performed by Dr. Brooks) were "okay." (IDOC 339.)  The record also lacks clarity on whether Plaintiff even communicated to Dr. Mitchell that he was currently in pain, rather than explaining that Dr. Brooks' procedure "messed [him] up," and "caused pain" in the past.  According to his medical records, Plaintiff's left-sided facial pain had improved by August, and on October 2, he told a doctor that the pain in his face was gone.[21] (Defs.' SOF ¶¶ 23, 26.)  After the October 18th appointment with Dr. Mitchell, he did not seek medical attention again for over two months, when he once again complained of pain.  (Pl.'s Resp. ¶ 29.)  Considering the totality of Dr. Mitchell's care, Plaintiff has not produced evidence that she

---

[20]　　Plaintiff attached these dental records as an exhibit to his complaint; Defendants also submitted a Bates-stamped version on summary judgment.  (IDOC 339.)

[21]　　Neither Dr. Mitchell nor Plaintiff submitted Plaintiff's medical records as exhibits to their summary judgment briefing. However, Plaintiff attached his medical records to his complaint, and the other Defendants attached most of these records to their motion for summary judgment.

"knew [Plaintiff] had a serious condition yet acted with indifference." *Owens v. Duncan*, 788 F. App'x 371, 374 (7th Cir. 2019) (single instance of staff members failing to give requested pain medication or summon prisoner for sick call was not deliberate indifference); *see also Gutierrez*, 111 F.3d at 1374–75 (explaining that "isolated instances of neglect" do not support deliberate indifference)

The appointments in 2014 and 2016 do not alter this conclusion. Plaintiff points to Dr. Mitchell's failure to examine his mouth during the July 16, 2014 appointment, despite swelling in his face, mouth, and teeth areas, as evidence of deliberate indifference. (Pl.'s Resp. to Mitchell ¶ 7.) But Dr. Mitchell referred Plaintiff to Dr. Obaisi on this day, and Plaintiff offers no support—legal or medical—that referring Plaintiff to a doctor, rather than examining the swelling herself, was radically outside the standard of dental care. Without more, the court cannot conclude that this choice amounted to deliberate indifference. *See Davis*, 938 F.3d at 915–16; *Whiting*, 839 F.3d at 663–64. Regarding the April 7, 2016 appointment, Plaintiff asserts that Dr. Mitchell "took no action," despite his complaints of dizziness and vertigo.[22] (Pl.'s Mem. to Mitchell at 5.) However, Plaintiff's cited complaint allegation merely states that he saw Dr. Mitchell for a yearly exam and complained of "the cause of his dizziness and vertigo"; there are no assertions regarding Dr. Mitchell's care or lack thereof. (Compl. ¶ 90). Plaintiff also provides his deposition testimony that "[t]he couple times I came to talk to [Dr. Mitchell], she just blew me away. She like didn't care."[23] (Silva Dep. 149:12–13.) Plaintiff omits the surrounding testimony, which makes

---

[22]     Plaintiff mentioned the April 19, 2016 appointment in his brief in opposition, but did not raise it in his response to Dr. Mitchell's statement of facts. (Pl.'s Mem. to Mitchell at 5.)

[23]     In his brief in opposition, Plaintiff cites to the deposition testimony "148:12–13," which discusses his complaints during the October 18, 2013 appointment. To the extent Plaintiff meant to cite that testimony, it is irrelevant to his April 17, 2016 appointment. The court assumes, however, that Plaintiff meant to cite 149:12–13, which aligns with the claim in his brief that when he complained of symptoms to Dr. Mitchell, "[her] demeanor . . . left Plaintiff with the clear impression that she was ignoring him and did not care." (Pl.'s Mem. to Mitchell at 5.)

clear that he was responding to a question about Dr. Mitchell's "role in the grievance procedure," not her actions during any specific appointment. (*Id.* 149:2–16.) This does not support his contention that Dr. Mitchell failed to respond to his complaints of dizziness on April 7, 2016, and he has not developed any argument about Dr. Mitchell's role in the grievance process on summary judgment.

Because Plaintiff has failed to raise any material factual issues about Dr. Mitchell's dental care, summary judgment as to his claim against Defendant Mitchell is granted.

### D. Dr. Brooks

#### 1. Statute of Limitations

Plaintiff's claim against Dr. Brooks is time-barred under the applicable statute of limitations. Illinois's two-year personal injury statute of limitations governs Plaintiff's claim, but federal law determines when that claim accrued. *See Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013); 735 ILCS 5/13-202. Accrual typically begins when the plaintiff "knows of his physical injury and its cause." *Devbrow*, 705 F.3d at 768. In *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001), however, the Seventh Circuit recognized that where there is an ongoing denial of medical treatment (as Plaintiff alleges here), the violation is "continuing," and the claim does not accrue "so long as the defendants had the power to do something about [plaintiff's] condition." *Id.* The parties devote pages of their briefing to arguing whether, under *Heard v. Sheahan*, the claim against Dr. Brooks accrued when he left Wexford's employ and could no longer treat Plaintiff. (*See* Defs.' Mem. at 12–14; Pl.'s Mem. at 10–11; Defs.' Reply at 12–13.) Both Plaintiff and Defendants overlook *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 518 (7th Cir. 2019), which squarely held that under the continuing violation theory, "[t]he date of the defendant's departure [from the institution] marks the last possible time when the claim might have accrued." Once Dr. Brooks left Wexford, "his involvement in the alleged wrong [was] over," and Plaintiff's claim against him accrued. *Id.*; *see also Heard v. Elyea*, 525 F. App'x 510, 511 (7th Cir. 2013).

Dr. Brooks left Wexford's employ in approximately February 2014. (Defs. SOF ¶ 71.) The two-year statute of limitations therefore expired in February 2016. Because Plaintiff did not file suit until February 20, 2018 [1], his claim against Dr. Brooks is time-barred.

## 2. Merits

Even if Plaintiff's claim were not time-barred, it fails on the merits. Plaintiff's primary contention is that Dr. Brooks botched the July 19, 2013 cavity filling. (Pl.'s Mem. at 9–10). The parties dispute whether Dr. Brooks' dental procedure caused Plaintiff's subsequent vertigo symptoms, but that is beside the point. (Defs.' Mem. at 7; Pl.'s Mem. at 1.) Regardless of the dental procedure's effects, Plaintiff must demonstrate Dr. Brooks' subjective culpability: that his errors during the procedure rose above negligence or medical malpractice, allowing an inference of deliberate indifference.

The record does not permit this inference. Dr. Brooks testified that during the procedure, he used two carpules of a local anesthetic and a short gauge needle to "infiltrate the anesthesia into the buccal vestibule of the maxilla." (Brooks Decl. ¶ 4.) Plaintiff insists that the syringes "were pretty long" and asserts that Dr. Brooks used a "long hypodermic needle" and injected him "at least five to six times," so deeply that it "penetrat[ed] [his] nerves," and Plaintiff "began to experience facial pain." (Silva Dep. 17:11–16; Compl. ¶ 44.) Plaintiff offers no expert testimony or medical records confirming that the needle or anesthesia penetrated his nerves or—as he alleged in his complaint—perforated a nerve in his eardrum, and the court is skeptical that a lay person could rationally perceive this. (Compl. ¶¶ 12, 16, 19); *see* FED. R. EVID. 701. But even if Dr. Brooks caused nerve penetration, Plaintiff lacks evidence that using a hypodermic needle and multiple injections is significantly outside the bounds of professional norms. *See Davis*, 938 F.3d at 915–16; *Whiting*, 839 F.3d at 663–64. Plaintiff points only to Dr. Brooks' own testimony, which states that he "complied with the applicable community standard of dental care" and that he used a short gauge needle. (Brooks Decl. ¶¶ 4, 8.) According to Plaintiff, that means using anything besides a short gauge needle violates the standard of care. (Pl.'s Mem. at 10). This mistakes

what is sufficient to meet the applicable standard of care with what is necessary. Moreover, even assuming Dr. Brooks violated this standard, that amounts to negligence; there is no evidence that Dr. Brooks *substantially* departed from professional norms. *See McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010) (dismissing claim where plaintiff alleged a negligent or grossly negligent tooth extraction because the dentist did not knowingly "create a substantial risk of complications").

Nor is there evidence that Dr. Brooks was deliberately indifferent to Plaintiff's pain. According to Dr. Brooks, Plaintiff "did not make complaints of pain nor did he appear to be in any distress" following the procedure. (Brooks Decl. ¶ 5). Plaintiff contends, however, that he informed Dr. Brooks that he was in pain, and Dr. Brooks said it would go away.[24] (Silva Dep. 149:6–8.) Plaintiff was also given Ibuprofen after the procedure; the record is unclear on whether Dr. Brooks prescribed it, but Plaintiff does not assert that he was denied painkillers after the procedure. (Defs.' SOF ¶ 19.) Though Dr. Brooks' belief that Plaintiff's pain would improve was incorrect, Plaintiff offers no evidence that every "minimally competent doctor" would have acted differently. *See Davis*, 938 F.3d at 915. There is also no evidence that Dr. Brooks was involved in Plaintiff's follow-up care, which is when Plaintiff presented with severe facial pain. Plaintiff disputes Dr. Brooks's claim that he received no communication from Plaintiff after the procedure, and asserts that he communicated his pain and need for further dental care by "see[ing] other

---

[24]    In his brief in opposition, Plaintiff supported his version of the July 19, 2013 dental procedure with citations to a complaint allegation, which does not discuss Dr. Brooks' response, (Compl. ¶ 44), and a prison grievance dated August 23, 2013, which was attached as an exhibit to Plaintiff's complaint. (Compl. at 51–52.) The grievance contains a section filled out by Plaintiff, which describes the July 19 procedure. (*Id.*) Statements in Plaintiff's prison grievance are technically hearsay, *see Heard v. Shicker*, No. 14-CV-1027-JBM, 2018 WL 11272881, at *2–3 (C.D. Ill. Apr. 23, 2018), *aff'd sub nom. Heard v. Tilden*, 774 F. App'x 985 (7th Cir. 2019); *Jordan v. Van Winkle*, No. 3:04CV647 RM, 2006 WL 2925657, at *3 (N.D. Ind. Oct. 6, 2006). However, Plaintiff also so testified at his deposition: "[W]hen Brooks finished with my teeth, I said, man, I don't feel good at all, and he said it's okay, it will go away," and "After [Dr. Books] finished putting in the injections, he waited a little while so the novocaine can work. I asked him – I said, man, my whole left side I feel pain. He said don't worry about it, it will go away, it's novocaine." (Silva Dep. 149:6–8, 174:24–175:4.)

dentists for this very reason"—but that reveals nothing about what Dr. Brooks knew. (Pl.'s Mem. at 10). Plaintiff also points to his August 23, 2013 grievance and a complaint allegation that he filed a grievance on July 20, 2013, and claims that the contents of these grievances were relayed to Dr. Brooks.[25] (Pl.'s Resp. ¶ 18.) In fact, however, the prison's written response to the August grievance states that it had "been forwarded to the C/O" (not Dr. Brooks), and Plaintiff's complaint merely alleges that he filed a grievance on July 20 (not that he relayed it to Dr. Brooks). (Compl. ¶ 30, at 51.)

In addition to his claim being time-barred, Plaintiff has not created a triable issue on whether Dr. Brooks' actions during or after the July 19 procedure amounted to deliberate indifference. Summary judgment as to Plaintiff's claim against Defendant Brooks is granted.

## IV.    Punitive Damages

Defendants also move for summary judgment on Plaintiff's claim for punitive damages. (Defs.' Mem. at 14.) Because Defendants Brooks, Martija, and Mitchell are not liable under § 1983, they cannot be held liable for punitive damages. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 661 (7th Cir. 2021). Dr. Obaisi, however, can. The culpability for punitive damages and deliberate indifference "is the same standard." *Woodward v. Corr. Med. Servs. Of Ill., Inc.,* 368 F.3d 917, 930 (7th Cir. 2004); *see also Walsh v. Mellas,* 837 F.2d 789, 801–02 (7th Cir. 1988). Because Plaintiff's § 1983 claim against Dr. Obaisi may proceed to trial, so may his claim for punitive damages.

For the first time on reply, Defendants argue that the goals of punitive damages (deterrence and punishment) are not served by awarding punitive damages against Dr. Obaisi's estate. (Defs.' Reply at 15.) This argument may be forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for

---

[25]     If Dr. Brooks had seen it, the August 23 grievance could show that Dr. Brooks had "knowledge of the matters contained within." *Heard*, 2018 WL 11272881, at *2–3.

the first time in a reply brief is forfeited."). In any event, while some courts in this district have accepted Defendants' argument, *see Zavala v. Obaisi*, No. 17-CV-03042, 2021 WL 1172774, at *12 (N.D. Ill. Mar. 29, 2021), the Seventh Circuit has not decided the issue. The court declines to rule on this issue before trial and without Plaintiff having the opportunity to respond. Summary judgment on punitive damages as to Dr. Obaisi is denied.

### CONCLUSION

Defendants' motion for summary judgment [64] is denied as to Defendant Obaisi, and granted as to Defendants Martija and Brooks. Defendant Mitchell's motion for summary judgment [81] is also granted.

ENTER:

Date:  September 30, 2021

_____
REBECCA R. PALLMEYER
United States District Judge